## ESTATE OF HEPSABETH HANNIGAN.

No. 7751—Sept. 1, 1877.

WILL.—MENTAL INCAPACITY ARISING FROM ALCOHOLISM.—A narrative of facts showing a mind impaired from such cause.

UNDUE INFLUENCE not a factor in arriving at a decision unfavorable to a will made by a person so mentally unsound.

Construing sections, C. C., 1272; C. C. P., 1312.

*E. S. Pillsbury* and *Budd & Budd*, for contestant.

*Alexander Campbell* and *H. A. Powell*, for proponent.

Samuel Fisher, former husband of deceased, died at Stockton in April, 1874. In the latter part of that year she removed to San Francisco and took rooms and board; and for some months next ensuing roomed and boarded at two

or three places respectively.   In 1875 she purchased the
residence 412 Jones street, where she continued to reside
until her death.

In May, 1876, she first met Mr. Hannigan.   Prior to
that she had at times received attentions from two or three
men of nearly her own age; but from the time that she and
Hannigan became acquainted, or soon after, he was the sub-
ject of her thought and conversation, and marriage to him
was her prevailing wish.   She and Hannigan met at the
houses of mutual acquaintances, and passed evenings en-
gaged in social amusements, such as card-playing, and the
like; and then he became a constant visitor at her house.

Her health was quite poor, and she had ill turns of physi-
cal and mental prostration.   In November, 1876, they be-
came engaged to marry.   About that time she became unable
to leave the house, and was thereafter mostly confined to
her bed.   It was arranged between them that their marriage
should occur at Christmas, 1876; but she being then sick in
bed, it was postponed.

On the 11th day of January, 1877, the marriage cere-
mony was performed between them.   That afternoon she,
accompanied by her nurse and a friend, rode to the office
of the Safe Deposit Company, she being bolstered with pil-
lows and taking stimulants during the ride; she gave direc-
tions that her funds and property in the vaults of the com-
pany should be subject to access by Mr. Hannigan.

After returning home she tried on a wedding dress which
had been made for her, and in the evening was dressed and
aided down stairs from her room to the parlor, and was
aided to stand while the ceremony was proceeding.

The clergyman officiating thought that the circumstances
were peculiar, but as a number of reputable people were
present he did not deem it necessary for him to institute
special inquiries.   She sat in the parlor in an easy chair
during the evening, receiving stimulants from her nurse.
Two days after that, the will in question was made.

Prior to the marriage ceremony, she had sent for an
attorney who had formerly transacted business for her, and
she advised with him in reference to a will, and he prepared

the will in question and was present at its execution.   Two physicians were also present, and subscribed to the will as witnesses.   One physician was called in to examine her as to soundness of mind; his interview did not exceed thirty minutes, but he declared her of sound mind.   Another physician, who had before attended upon her, did not upon the trial express a decided opinion upon that subject; but on the same evening of the execution of the will, after leaving the house, did declare that he had that evening witnessed the execution of a will, and that the woman who made it was no more fit to make a will than a boy of four years.

The attorney read the will to her, section by section, and asked her if that was her wish, to which she assented; she seemed, to the persons present, to understand the business in hand, although she was very ill and weak; the will was executed and attested in due form.

The story of her remaining days is soon told.   She failed rapidly.   On the 26th of February Dr. Ingerson was called; he found her in a moribund condition; by the 10th of March her mind was entirely gone; she was then weak, sick and imbecile, helpless and senseless, in which condition she lingered until the 5th of April, and then, the end.

During the lifetime of Mr. Fisher, at least for some time, Mrs. Fisher had been addicted to the use of intoxicating liquors, to the extent of being frequently under their influence, causing loss of sleep, restlessness, and occasional walking at night.   After his death she drank more; and during the last year or two of her life she consumed on an average a gallon of whiskey a week.   For months before her death she had such a craving for liquor that she could not resist its influence.

Her physicians warned her that death would ensue unless she ceased such free use of alcohol, but without effect. The demijohn had to be hid from her, and the whiskey doled out to her in smaller quantities.   She would have it, and a tumbler of it was placed on her table on retiring, for night use.   Dr. Langdon, who had been her physician in Stockton, and saw her after she removed to this city, testified that her intellect was much impaired by liquor; that two years

before her death he observed evidences of approaching de-
mentia; that in San Francisco she was weak-minded, failing
gradually; that she had organic disease of the liver induced
by alcohol.  Other physicians, among them Dr. Shurtleff,
of the Insane Asylum at Stockton, and Dr. Clark, of the
Nevada State Insane Asylum, were examined as experts, and
testified as to the effect of alcohol upon the brain.  Bland-
ford, a medical writer, says that women, from the delicacy
of their organization, are more susceptible to alcoholism and
its effects than men; that when they reach a certain point,
there is no hope.  The natural and necessary effect of the
liquor used by her was to permanently impair her intellect;
and where fixed mental disease has supervened upon intem-
perate habits, the person is incompetent and irresponsible.
(5 Mason, C. C., 28.)

Various persons, friends and associates of the deceased,
were examined as witnesses, some testifying to a large use of
liquor, frequent intoxication, strange actions, childish and
foolish deportment, and a love of youthful display with gay
colors in dress; while others saw nothing to excite remark.
The line between the two classes of testimony is strongly
marked; but the view which I take of this case does not re-
quire me to express an opinion as to the respective truthful-
ness and good faith of these witnesses, with one exception.
That exception is the alleged husband of the deceased.  She
was 63 years of age, he 46; she was wealthy, he impecunious;
she weak in mind and failing in health, he strong and vigor-
ous.  He, knowing that she could live but a short time, that
she was drinking herself to death, that thoughts of love,
association, procreation, were absurd, took her for her
money.

He testified at one time that he never saw her intoxicated,
but was forced to admit that he hid the demijohn of whiskey
to keep it away from her.  He obtained $2,500 of her money
at a time when she was not able to transact any business,
and applied the most of it to his own use.

Taking into consideration the facts that for years she had
been addicted to the excessive use of alcohol, that such use
caused the disease of which she died, that it weakened her

body and mind, that its necessary result was to produce mental disease and physical death, that her intellect was impaired as early as 1875. That in November, 1876, she had become a confirmed invalid; that in February, 1877, she was in a moribund condition, that her mind entirely gave way in March and that she died in April, I am forced to conclude and so find, that at the time of the execution of the alleged will the deceased was not of sound and disposing mind; that probably from and after April, 1876, certainly from and after November, 1876, she had not sufficient mind to make any important contract, or to comprehend her relations in life, the character and condition of her property, and the persons to whom and the proportions in which she wished her property to go.

The conclusion of law is that the proposed paper is not the will of deceased and that she died intestate.

I have not, herein, considered the question of undue influence, for the reason that, if she was of unsound mind, it does not matter whether influence was or was not exercised. It is true that the proposed will would give the bulk of the estate to Mr. Hannigan. If the deceased had been of sound mind, she would have had the right to do so. She might, possibly, have found reasons therefor in the differences which had arisen in the family, in coldness of demeanor and apparent neglect on the part of those few with whom blood connected her. I base my opinion of this case solely upon the mental condition of the deceased, leaving the living to form such estimate of filial duties performed and unperformed as they may be advised.

Let a decree be entered accordingly.